UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-134 |
| v. | * | SECTION: M |
| BEVERLY MCCRARY | * | |
| | * * * | |

## FACTUAL BASIS

The United States and defendant **BEVERLY MCCRARY** ("**MCCRARY**") stipulate and agree that the below facts are true and that they would have been proven beyond a reasonable doubt had this matter proceeded to trial. The United States and **MCCRARY** further stipulate and agree that these facts provide a sufficient basis for a plea of guilty to Count 1 of the above-captioned indictment's charge that **MCCRARY** violated Title 18, United States Code, Section 371. The below facts are offered for the purpose of establishing a sufficient factual basis to support the guilty plea and therefore do not necessarily describe all the details of the offense or **MCCRARY's** complete knowledge of the offense.

As explained below, **MCCRARY** and other persons made an agreement to interfere by dishonest means with the United States Coast Guard's ("USCG") lawful functions of issuing merchant mariner credential ("MMC") endorsements and of administering related examinations. **MCCRARY** knew that the purpose of the agreement was to defraud the United States government and joined in it willfully, that is, with the intent to defraud. During the conspiracy's existence, and in order to accomplish the conspiracy's objects and purposes, conspirators knowingly committed overt acts, including falsely reporting in USCG computer systems that examinations were passed.

AUSA _C h_
Defendant _DM_
Defense Counsel _Kw_

A.      **At all times relevant herein:**

The USCG's governmental functions, as authorized by federal statutes and regulations ("federal law"), included, among other things, the administration, regulation, and enforcement of the regulations and laws relating to the issuance of merchant mariner credentials ("MMCs") and related endorsements, including the applications and examinations associated with MMCs and endorsements. Under federal law, all mariners employed aboard United States merchant vessels greater than 100 gross registered tonnage, with a few limited exceptions, were required to have valid MMCs. Furthermore, to serve in various positions, federal law required mariners to have particular endorsements added to their MMCs. In order to obtain an MMC, a mariner was required to meet various requirements and to take an oath, promising to faithfully and honestly perform all the duties required by the laws of the United States.

Endorsements determined what position mariners could work, on what kind of vessels, and in what waters. The presence of an endorsement on an MMC indicated that the mariner was qualified to serve in the specified capacity and had met all legal requirements for that endorsement. Federal law prohibited a mariner from serving in a position for which the mariner lacked the required endorsement. Similarly, federal law prohibited a business from employing a mariner in a position for which the mariner lacked the required endorsement.

For many endorsements, federal law required mariners to pass USCG-administered examinations. These examinations tested mariners' knowledge and training to safely operate under the authority of the endorsements. The examinations, which typically consisted of numerous separately-graded modules, were administered at USCG regional exam centers. One such regional exam center, known as REC New Orleans, was located in Mandeville, Louisiana, in the Eastern District of Louisiana. USCG employees at the regional exam centers entered the scores into a

AUSA _OM_
Defendant _BM_
Defense Counsel _PW_

United States Coast Guard computer system used to manage the issuance of credentials to mariners and to process applications for MMCs and endorsements.

In some situations, passing an examination for one endorsement could enable a mariner to obtain one or more additional endorsements. This could occur, for example, if the examination fulfilled a requirement for an additional endorsement or if obtaining the tested-for endorsement fulfilled a requirement for an additional endorsement.

Dorothy Smith ("Smith") and **MCCRARY** were employed by the United States Coast Guard as credentialing specialists at REC New Orleans until in or about August 2019 and in or about August 2015 respectively. Alexis Bell ("Bell"), Micheal Wooten ("Wooten"), and Sharron Robinson ("Robinson") worked in the maritime industry.

**B.      MCCRARY conspired to defraud the United States**

Prior to April 2012, Smith informed **MCCRARY** of a conspiracy to interfere with the USCG's lawful governmental functions through dishonest means. Specifically, Smith informed **MCCRARY** that Smith would, in exchange for money, falsely report that credential applicants had passed examinations required for endorsements.

**MCCRARY** and Smith agreed that **MCCRARY** would participate in the scheme by acting as an intermediary between Smith and credential applicants who were willing to pay money for false passing scores. **MCCRARY** and Smith agreed that **MCCRARY** would: recruit mariners to participate in the scheme; provide Smith with the information necessary for Smith to enter the desired false scores; collect money from the mariners; keep a portion of the money obtained from the mariners; and provide Smith the remaining portion of money obtained from the mariners.

**MCCRARY** then proceeded to recruit mariners to participate in the scheme by informing them that, in exchange for money, she could arrange for them to receive false passing examination

3



AUSA _C M_
Defendant _____
Defense Counsel _____

scores at REC New Orleans and could thereby aid them in obtaining endorsements to which they were not lawfully entitled. **MCCRARY** recruited some of these mariners while she was on duty at REC New Orleans. For example, when mariners came to the REC to conduct testing and other matters related to their credential applications, **MCCRARY** would, at times, strike up conversations with them and proceed to solicit them to engage in the scheme. In some instances, mariners who participated in the scheme referred other mariners to **MCCRARY**, and **MCCRARY** would then obtain false scores for those other mariners.

**MCCRARY** also developed a network of intermediaries that operated beneath her in the scheme. These intermediaries included Bell, Wooten, and Robinson, each of whom was a credentialed mariner that had obtained his or her own false examination scores through **MCCRARY**. These intermediaries and **MCCRARY** agreed that the intermediaries would recruit mariners to engage in the scheme. Typically, these intermediaries would provide **MCCRARY** with the necessary money and information to obtain false scores for a mariner without **MCCRARY** having any direct contact with the mariner. In some instances, an intermediary would put the mariner in contact with **MCCRARY**, who would then interact directly with the mariner.

To arrange false scores, **MCCRARY** almost always required upfront cash payments. On occasion **MCCRARY** would accept non-monetary things of value in exchange for arranging the scores. For example, from one mariner, **MCCRARY** accepted coolers of fresh caught shrimp in exchange for arranging false examination scores.

To make it less likely that the scheme would be discovered, **MCCRARY**, at times, provided various directions to mariners involved in the scheme. For example, **MCCRARY** instructed mariners: to not contact the REC regarding their credential applications; to not work on vessels during the days they were supposed to be testing; and to use code words when discussing

4

AUSA _____
Defendant _____
Defense Counsel _____

the scheme on the telephone.

**MCCRARY** maintained in her home handwritten and electronic notations regarding the identities of mariners that participated in the scheme. **MCCRARY** also possessed in her home examination materials and other USCG documents that she had improperly removed from REC New Orleans. The Coast Guard Investigative Service recovered this evidence from **MCCRARY's** home.

Overt acts committed in furtherance of the conspiracy included Smith's false reports of examination scores and **MCCRARY's** receipt of a money transfer, on or about October 6, 2017, from a credential applicant for the purpose of arranging false examination scores.

From prior to April 2012 until in or about May 2019, **MCCRARY**, by having provided money and information to Smith, caused Smith to falsely report that more than 50 mariners had passed exams. Some of these mariners obtained false scores for multiple exams. Each false examination report resulted in the issuance an unearned endorsement, with almost all of the endorsements being officer-level and a few being rating-level.

2/24/22
CHANDRA MENON                                    Date
Assistant United States Attorney

2/24/22
RALPH WHALEN JR.                                  Date
Counsel for Defendant

2/24/22
BEVERLY MCCRARY                                  Date
Defendant